Bernard H. WEAVER, Jr., Plaintiff–
Appellee–Cross–Appellant,

v.

Robert BRENNER; Beth Gable, also known as Beth Cozzolino, Individually and as Assistant District Attorney for the County of Columbia, Defendants,

David W. Harrison, Individually and as Investigator with the Office of the Columbia County District Attorney and as a New York State Police Officer; John J. Holt, Individually and as a New York State Police Investigator; Paul Czajka, Individually and as District Attorney for the County of Columbia, Defendants–Appellants–Cross–Appellees.

Nos. 662–664, Dockets 93–7383,
93–7429, 93–7491.

United States Court of Appeals,
Second Circuit.

Argued Dec. 6, 1993.

Decided Oct. 26, 1994.

Frank K. Walsh, Asst. Atty. Gen., Albany, NY (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel, Asst. Atty. Gen., of the State of New York, of counsel), for defendant-appellant John J. Holt.

James A. Resila, Albany, NY (Carter, Conboy, Bardwell, Case, Blackmore & Napierski, of counsel), for defendants-appellants David W. Harrison and Paul Czajka.

Mark T. Walsh, Albany, NY (Michael P. Ravalli, Gleason, Dunn, Walsh & O'Shea, of counsel), for plaintiff-appellee Bernard H. Weaver, Jr.

Before: OAKES, KEARSE, and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

One of the principal issues we deal with on this appeal is what conduct violates the Fifth Amendment. That Amendment safeguards a suspect's right to remain silent. This right is based on the painful lessons of history, among the most prominent of which was the Spanish Inquisition, and it teaches that to be silent is safe and to speak risks betrayal of oneself.

Defendants Paul Czajka, David W. Harrison, and John J. Holt appeal from a portion of the April 19, 1993 order of the United States District Court for the Northern District of New York (McAvoy, J.). That order denied defendant Czajka's motion, as district attorney for Columbia County, New York, and defendants Harrison and Holt's motion, as County and State police investigators, respectively, for summary judgment based on their assertions of qualified immunity, insofar as plaintiff's cause of action is based on his allegation that his statements were allegedly coerced in violation of the Fifth and Fourteenth Amendments. Plaintiff Bernard H. Weaver, Jr., cross-appeals from a portion of the same order that granted defendants' motions for summary judgment based on a finding of qualified immunity for plaintiff's arrest and prosecution. For the reasons that follow, we affirm in part and dismiss in part with respect to the appeal; the cross-appeal is dismissed.

## BACKGROUND

Bernard H. Weaver, the plaintiff in this case, is a teacher of 20 years standing. During the 1978–79 school year, while teaching the fifth grade in the Pine Planes Central School District in Pine Planes, New York, he befriended Robert Brenner, a student in his class. Brenner came from a broken and unstable home. When he was 15 years old, he told Weaver that his mother had become abusive towards him, and that he planned to run away on his 16th birthday. Later that year Brenner confided in Weaver that his mother had threatened to kill him. On March 23, 1984, two days before his 16th birthday, Brenner again told Weaver that he planned on leaving home on his birthday. Weaver volunteered to ask Brenner's grandmother to intercede and, if matters did not sort themselves out, to help Brenner himself.

On March 25 Brenner left home and went to stay with Weaver at Weaver's parents' home. Those living arrangements continued for the next 17 months, until August of 1985. Following a complaint by Brenner's mother, the School District investigated Weaver for his role in Brenner's leaving home. Eventually Weaver was served with disciplinary charges for conduct unbecoming a teacher. Brenner testified under oath at hearings on the charges, and specifically denied having had any sexual relations with Weaver. Brenner also signed an affidavit to the same effect. The administrative panel conducting the hearing into Weaver's fitness to serve as a school teacher terminated Weaver's employment. The Appellate Division unanimously confirmed Weaver's discharge as a teacher. See Weaver v. Board of Educ., 129 A.D.2d 711, 514 N.Y.S.2d 473 (2d Dep't), appeal denied, 70 N.Y.2d 607, 519 N.Y.S.2d 1031, 514 N.E.2d 389 (1987).

Three years later, on October 23, 1988, Brenner contacted the State Police and signed a statement for defendant, Columbia County Investigator Harrison, alleging that Weaver had committed acts of sodomy on him when he was underage. Specifically, Brenner declared that on the night he moved in with Weaver—March 25, 1984—Weaver fondled him, and that for the next three

months, a couple of times a week, they engaged in oral sex, and that once during this period they engaged in anal sex.

Defendant State Police Investigator Holt assisted County Investigator Harrison with the investigation. Each of them recorded one of two telephone calls Brenner made at their instigation to Weaver: first, in November 1988 and later in February 1989. During these telephone conversations Brenner confronted Weaver with specific acts of sexual conduct between them. Although Weaver did not specifically deny the allegations, he explained to Brenner that he thought Brenner was confusing some of his experiences of abuse involving family members with his relations with Weaver. Weaver said he did not believe any of their contact was sexual. Yet, some of Weaver's statements during these recorded conversations were incriminating. For example, he objected to Brenner's having sexual relations with women at college and Brenner responded "but you and I did," to which Weaver replied, "but I was not happy with that." Weaver later explained in an affidavit that one night he was awakened by Brenner "poking around [Weaver's] back side with his erect penis." Weaver claims to have terminated Brenner's activity immediately, and explained to him that this was not something he wanted to participate in and that he did not approve of Brenner's conduct.

On February 21, 1989 Investigators Harrison and Holt, in plainclothes, went to Weaver's home to question him. Although believing they had sufficient evidence to arrest him, the officers did not obtain an arrest warrant, nor did they give Weaver his *Miranda* warnings prior to questioning him. *See People v. Weaver*, 177 A.D.2d 809, 810, 576 N.Y.S.2d 424, 425 (3d Dep't 1991).

How long the interview between the investigators and Weaver lasted and what occurred during it is a matter of dispute. Weaver insists it was intimidating and threatening. He was told that if he cooperated, the investigators might be able to keep the story from the press. Investigator Harrison produced notes from the interview indicating that when he questioned Weaver about fondling Brenner on the March night when Brenner moved in, Weaver responded,

"Well it wasn't like that. I can't deny this. We did go to bed together during the time he was staying with me at my parents. I've been in bed with him on camping trips when I took some boys." The notes also reflect that when Weaver was asked about having anal sex with Brenner, he replied he did not think he should answer that question. Weaver then asked if he could have a copy of the taped telephone conversations to give to his attorney. Because Weaver mentioned an attorney, Officer Harrison then said he had to stop the interview. After terminating the interrogation, Officer Harrison read Weaver his *Miranda* warnings and placed him under arrest for sodomy in the third degree.

Before the grand jury Officer Harrison testified in detail regarding the confession he obtained from Weaver. On April 26, 1989 Weaver was charged in an indictment with seven counts of third degree sodomy. After a hearing, the County Court suppressed the earlier November 1988 taped telephone conversation as inaudible; it also suppressed some incriminating statements given by Weaver during the February 21st interview with the two defendant investigators. In addition, the County Court dismissed the first count in the indictment as barred by the statute of limitations. On appeal from these rulings, the Appellate Division affirmed. *See People v. Weaver*, 177 A.D.2d at 809–10, 576 N.Y.S.2d at 424–25.

The Appellate Division found the investigating officers knew they had sufficient evidence to arrest Weaver prior to questioning him, that Weaver was not in a position to leave the interview, and that he was therefore entitled to *Miranda* warnings prior to being interrogated. The court opined Weaver's interview by the defendants was "designed to deliberately subjugate" Weaver to police authority and to "extract a confession" without the benefit of *Miranda* warnings. 177 A.D.2d at 810, 576 N.Y.S.2d at 425. Following this ruling, the district attorney, defendant Czajka, certified to the Appellate Division that the suppression order which had been affirmed on appeal rendered the remaining proof insufficient as a matter of law to obtain a conviction. On April 2, 1992

the County Court signed an order dismissing the indictment against Weaver.

Weaver filed the instant § 1983 civil rights suit on February 20, 1992. In his complaint he alleged 11 causes of action against the defendants, only three of which are relevant to this appeal—false arrest, malicious prosecution and unlawful coercion of a confession. Defendants moved for summary judgment on these three claims, which the district court granted in part, and denied in part. First, Judge McAvoy addressed their merits to determine whether there were material issues of fact precluding summary judgment. With respect to the false arrest and malicious prosecution claims, he found a reasonable jury could conclude there was an absence of probable cause, and that malice might be present. As to the claim of a coerced confession, he found genuine issues of fact existed regarding whether Weaver's Fifth and Fourteenth Amendment rights had been violated, also precluding summary judgment. Therefore, the district court stated summary judgment would not be granted on the merits. Relying on *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir.) (*en banc*), *cert. denied*, —— U.S. ——, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992), the trial court further ruled the fact that Weaver's statements were not used at trial did not defeat his constitutional claims.

Next, the district court addressed defendants' assertions of qualified immunity. As to the false arrest and malicious prosecution causes of action, it concluded that it was objectively reasonable for defendants to believe probable cause existed, thus entitling them to qualified immunity. With respect to the unconstitutional coercion claim, the trial court rejected defendants' version of the relevant issue: whether at the time of Weaver's questioning it was clearly established law that a constitutional violation could occur where coerced statements were never used in court. Again relying on *Cooper*, the district court stated instead that the issue was the unlawfulness of coercing incriminating statements from a suspect, a standard that was clearly established in 1986. It ruled that if defendants were attempting to coerce a confession, they were not entitled to qualified immunity. Defendants appeal the denial of

qualified immunity on the coercion claim, and plaintiff cross-appeals from the grant of qualified immunity for the false arrest and malicious prosecution causes of action.

## DISCUSSION

When it passed the Civil Rights Act of 1871 Congress created a civil cause of action for citizens against public officials who, acting under color of state law, violate a person's legal rights, guaranteed either under the Constitution or federal law. The current version of this cause of action provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (1988).

The issue broadly presented under this civil rights statute is whether coercing an incriminating statement from a suspect during custodial interrogation by the police violates the suspect's Fifth and Fourteenth Amendment rights. More specifically for purposes of this appeal, the issue is whether such violation is actionable under § 1983, even though the incriminating statement was not introduced at trial.

### I  The Doctrine of Qualified Immunity

■ The goal of § 1983 is to deter public officials from violating citizens' federal rights and to compensate victims of such official wrongdoing. The doctrine of qualified immunity weighs this important interest in citizens' civil rights against the policies of encouraging qualified persons to accept public positions and ensuring that public officials vigorously discharge their duties. The balance struck under the doctrine of qualified immunity has been formulated as a rule: public officials are immune from § 1983 civil rights suits brought by an aggrieved citizen when their "conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■■■■ It is not necessary that the questioned action have been previously held unlawful for the official to be held liable; rather, it is enough if the unlawfulness is apparent in light of pre-existing law. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). On the other hand, even if the right apparently existed at the time of the official's conduct, if judicial decisions later clarify that the right in fact did not exist, the conduct will not subject the official to liability. *See Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989). Further, even when the right in question was clearly established at the time of the alleged unlawful conduct, an official is still entitled to immunity were it objectively reasonable for him to believe the conduct lawful. *See O'Neill v. Babylon,* 986 F.2d 646, 649 (2d Cir.1993).

## II Appellate Jurisdiction Over Denial of Qualified Immunity

Appellate jurisdiction exists under 28 U.S.C. § 1291 (1988) to hear appeals from "final decisions" of the district courts. Under the collateral order doctrine, a district court decision is final if it "finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949).

■■■ It has long been settled that § 1291 is given a practical rather than a technical construction so that the denial of a defendant's motion for summary judgment in a civil rights suit under § 1983 on the grounds of qualified immunity—to the extent the district court's decision turns on an issue of law—is immediately appealable as a collateral order. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985). Appellate jurisdiction is conferred despite the lack of a final order, because

qualified immunity provides not simply immunity from official liability; it shields public officials from having to respond to civil litigation, that is, it grants such officials immunity from suit, sparing public officials who responsibly perform their duties from the burdens and expense of litigation. *See id.* at 526–27, 105 S.Ct. at 2815–16; *Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992).

■■■ Nonetheless, if resolution of the qualified immunity defense hinges upon disputed factual issues, or upon mixed questions of fact and law, an immediate appeal does not lie under the collateral order doctrine. Appellate review must in that event await resolution of the factual issues at trial. *See DiMarco v. Rome Hosp.,* 952 F.2d 661, 665 (2d Cir.1992). The reason for this is plain: when material factual issues are present, a district court decision does not finally determine any claims of right. Whether the applicability of qualified immunity depends upon genuine issues of material fact is a legal question subject to *de novo* review. *See Cartier,* 955 F.2d at 844.

## III Qualified Immunity in the Instant Case

### A. *Clearly Established Right*

■ The threshold issue in deciding whether a public official is entitled to qualified immunity is, as noted, whether the federal right was clearly established at the time the alleged violation occurred. *See Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). This is solely a question of law, *see, e.g., Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994), to be resolved under our appellate jurisdiction pursuant to the collateral order doctrine.

It is clear that on February 21, 1989, the date when Weaver was questioned by Investigators Harrison and Holt, a criminal suspect could not lawfully be compelled to be a witness against himself. The right of a criminal suspect to be free from the use of compelled statements is guaranteed by the Fifth Amendment's privilege against self-incrimination. It was also clearly established in

1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect. The right of a citizen to be free from such offensive police behavior is guaranteed by the Due Process Clause of the Fourteenth Amendment, which prohibits police conduct that undermines the requirements of decency and fairness implicit in the concept of ordered liberty. We examine each of these constitutional rights in turn.

### 1. The Privilege Against Self-Incrimination

■ In order for a plaintiff to have a viable § 1983 cause of action for a violation of his Fifth Amendment right, he must establish that police officials, acting under color of state law, subjected him to the deprivation of that constitutional right. While this statement seems elementary on its face, in the murky arena of Fifth Amendment jurisprudence the task of defining precisely when the Amendment is violated is not so simple.

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. It guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964). Defendants do not dispute that the Fifth Amendment guarantees the privilege against self-incrimination; instead, they insist the privilege cannot be violated unless the fruits of unlawful official conduct are carried into court. In their view, it is lawful for state actors to coerce incriminating statements from a suspect in custody, so long as those statements are not subsequently introduced against the suspect at trial.

■ Our first task therefore is to pinpoint when the Fifth Amendment is violated. The difficulty of doing so stems in large part from certain ambiguities in the Supreme Court's seminal decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To most, the *Miranda* decision is associated entirely with the now well-known *Miranda* warnings. Those warnings serve to reinforce the underlying Fifth Amendment right to be free from compulsory self-incrimination. They are a prophylactic, a device to bring home to a suspect his pre-existing right to assert the privilege against self-incrimination, that is, his right to remain silent. *See id.* at 469, 86 S.Ct. at 1625.

■ The emphasis placed on the *Miranda* warnings pervades the litigants' arguments in the instant case. Hoping to dispense with plaintiff's Fifth Amendment claim, defendants assert that the failure, as occurred here, to read a suspect his *Miranda* warnings is not in itself a Fifth Amendment violation. We recognize, of course, that the *Miranda* warnings are prophylactic only; they are not constitutional rights in themselves. *See Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985). Hence, we agree with defendants that the failure to read the warnings does not standing alone give rise to a constitutional violation of Weaver's rights.

Agreeing with defendants does not resolve the issue before us. The reading of (or failure to read) *Miranda* warnings only has a presumptive effect on whether or not an individual's Fifth Amendment rights have been violated. *Id.* at 306–07, 105 S.Ct. at 1291–92. To state this more simply, saying *Miranda* warnings are not required by the Constitution does not end the inquiry into whether a suspect's underlying Fifth Amendment rights may have been violated.

We must nonetheless begin analysis of when the Fifth Amendment is violated with *Miranda,* although looking to a portion of the opinion that is often lost in the long shadow cast by the Supreme Court's prescribing of the prophylactic warnings. What the *Miranda* Court made clear is that the protections of the Fifth Amendment apply during custodial interrogation of a criminal defendant, since that is when criminal proceedings begin. *See Miranda,* 384 U.S. at 477, 86 S.Ct. at 1629. This is the linchpin of the entire opinion, as pointed out by then Justice (now Chief Justice) Rehnquist in *Michigan v. Tucker,* 417 U.S. 433, 443, 94

S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974) ("the Court in *Miranda,* for the first time, expressly declared that the Self–Incrimination Clause was applicable to state interrogations at a police station").

██ Yet *Miranda* does not settle the question we now focus on, that is, whether the Fifth Amendment is violated by the act of coercing an incriminating statement from a suspect; or, whether coercion must be coupled with something more. Appellants contend that the coerced statement must be introduced at the individual's trial before the Amendment is violated. We disagree.

The Fifth Amendment by its own terms grants a person the right to be silent so as not to be a witness against himself in a criminal case, and to suffer no penalty for the exercise of that right. As noted above, it is well-settled that for these purposes the criminal case begins with custodial interrogation. *See Miranda,* 384 U.S. at 477, 86 S.Ct. at 1629; *see also Michigan v. Tucker,* 417 U.S. at 440, 94 S.Ct. at 2362 ("Although the constitutional language in which the privilege is cast might be construed to apply only to situations in which the prosecution seeks to call a defendant to testify against himself at his criminal trial, its application has not been so limited."); *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) ("The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."). The criminal case of course culminates at trial. In the period between the commencement and the culmination of a criminal case, the Fifth Amendment guards against governmental use of a coerced statement that inflicts a penalty on the suspect. As a consequence, we hold that use or derivative use of a compelled statement at *any* criminal proceeding against the declarant violates that person's Fifth Amendment rights; use of the statement at trial is not required.

This holding fits well within the Supreme Court's discussion of the scope of the Fifth Amendment in the area of immunity. For example, in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court declared that the Fifth Amendment's "sole concern is to afford protection against being 'forced to give testimony leading to the infliction of [criminal penalties].'" *Id.* at 453, 92 S.Ct. at 1661 (quoting *Ullmann v. United States,* 350 U.S. 422, 438–39, 76 S.Ct. 497, 507, 100 L.Ed. 511 (1956)). As a result, it held that a statute granting use and derivative use immunity does not violate the Fifth Amendment because it "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* (emphasis in original); *see also Lefkowitz,* 414 U.S. at 84, 94 S.Ct. at 325 ("Although due regard for the Fifth Amendment forbids the State to compel incriminating answers ... that may be used ... in criminal *proceedings,* the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use.") (emphasis added).

Moreover, the Ninth Circuit sitting *en banc* has rejected the use-at-trial requirement. *See Cooper v. Dupnik,* 963 F.2d at 1220. *Cooper* held that a § 1983 plaintiff stated a cause of action for violation of his Fifth Amendment rights where he alleged the police had coerced incriminating statements from him while he was in custody, even though the statements were not used at trial. *See id.* at 1242–44. Our rejection of the use-at-trial requirement finds further support in an opinion written by Retired Supreme Court Justice Powell, sitting by designation in the Fourth Circuit. Faced with a § 1983 claim similar to that now confronting us, Justice Powell opined that the language in the Supreme Court's Fifth Amendment jurisprudence suggests that the right against self-incrimination is violated by "use of the compelled statements against the maker *in a criminal proceeding.*" *Wiley v. Doory,* 14 F.3d 993, 996 (4th Cir.1994) (emphasis added). The Seventh Circuit apparently has adopted a similar position. *See Mahoney v. Kesery,* 976 F.2d 1054, 1061–62

(7th Cir.1992) (Fifth Amendment forbids the use of forcibly extracted information " 'as evidence in a criminal case' ") (quoting *Wilkens v. May*, 872 F.2d 190, 194 (7th Cir.1989), *cert. denied*, 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990)); *see also Davidson v. Strack*, No. 83 Civ. 6521–CSH, 1986 WL 2813, at *2 (S.D.N.Y. Feb. 25, 1986) (Fifth Amendment forbids use of forcibly extracted information only in "subsequent criminal *proceedings* ") (emphasis added); *cf. Miller v. Garrett*, 695 F.Supp. 740, 746 (S.D.N.Y.1988) (constitutional violation when statements "are used in some way to incriminate the speaker").

■ In the instant case, Officer Harrison testified before the grand jury, and described in detail the confession he had obtained from Weaver. The use of a coerced confession before a grand jury plainly makes Weaver a witness against himself in a criminal case, one leading to the infliction of criminal penalties against him. Such use, if the confession is found as a fact to have been coerced, violates Weaver's constitutional rights and serves as a predicate for his § 1983 action.

### 2. *Fourteenth Amendment Substantive Due Process.*

■ The Due Process Clause of the Fourteenth Amendment requires that state action not transgress those fundamental notions upon which all of our civil and political institutions are based. *See Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936). It was clearly established in 1963 that the constitutional violation is complete when the offending official behavior occurs, and the refusal to admit at trial statements made as a result of coercion is merely a corrective way in which a court penalizes conduct that violates the Constitution. *See Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963) ("[A] confession obtained by police through the use of threats is violative of due process.").

■ Despite holding that the Fifth Amendment privilege against compulsory self-incrimination applies to the several States, the Supreme Court continues to analyze coercive interrogation techniques under the Due Process Clause. *See Colorado v.* *Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 519–20, 93 L.Ed.2d 473 (1986). The test under the Due Process Clause is whether the suspect's statements were made voluntarily, which depends upon examining all of the circumstances surrounding the interrogation to see if police overreaching overcame a suspect's will and led to an involuntary confession, one not freely given. *See Campaneria v. Reid*, 891 F.2d 1014, 1019–20 (2d Cir.1989), *cert. denied*, 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). Hence, it was clearly established in 1989 that criminal suspects had a due process right to be free from official conduct designed to overcome the accused's will and produce an involuntary incriminating statement.

■ This conforms to the view of the Ninth Circuit, *see Cooper*, 963 F.2d at 1244–45 (coercive behavior of police in pursuit of a confession violates due process and violation is complete with the coercive behavior itself), and is also consistent with the Seventh Circuit's holding in *Duncan v. Nelson*, 466 F.2d 939 (7th Cir.), *cert. denied*, 409 U.S. 894, 93 S.Ct. 116, 175, 34 L.Ed.2d 152 (1972). *Duncan* concluded that a § 1983 plaintiff stated a valid claim for the deprivation of his Fourteenth Amendment rights founded on a coerced confession, and was entitled to present proof concerning damages that defendant police officers knew or should have known he would suffer as a result of the unlawful interrogation and confession. Although the officers could not be held liable for plaintiff's conviction and incarceration, the court stated that psychological coercion could violate due process, and that defendants could be liable for the mental anguish suffered by plaintiff as a result of defendants' conduct. *See id.* at 943–45. To the extent that the district court rejected as a matter of law appellants' contention that their conduct was beyond the reach of the Fifth Amendment and the Due Process Clause, we affirm.

### B. *Objective Reasonableness of Officers' Beliefs*

■ As already stated, a determination that the relevant right was clearly established at the time it was allegedly violated by the public officials does not end the qualified

immunity inquiry. The defendants are still entitled to qualified immunity if it was objectively reasonable for them to believe their actions were lawful. *See Kaminsky,* 929 F.2d at 925. The district court held that factual disputes as to each defendant's conduct precluded resolution of this question on summary judgment. If such a factual determination of each defendant's conduct is material to the issue of qualified immunity, then we must dismiss this portion of the appeal for lack of jurisdiction, and review must await resolution of the factual dispute. *See Cartier,* 955 F.2d at 844.

While defendants concede that there is a factual dispute over what their actions were, they argue that this dispute does not preclude resolution of the qualified immunity issue because the disputed issues of fact are not material. Even accepting plaintiff's factual allegations as true, and viewing them in the light most favorable to plaintiff, defendants claim they are entitled to qualified immunity as a matter of law because it would have been objectively reasonable for them to have believed the actions they took were lawful.

Plaintiff has alleged that Czajka advised Investigators Holt and Harrison that there was probable cause to arrest Weaver and directed them to attempt to coerce a confession from Weaver before arresting him, and that the other two officers carried out this instruction and extracted incriminating, involuntary statements from Weaver. According to plaintiff's allegations, officer Harrison accused him of being the cause of Brenner's emotional troubles and stated that if Weaver cooperated they could "keep this out of the newspapers." Investigator Holt confronted Weaver with the taped telephone conversations and officer Harrison repeatedly stated that Weaver was facing over a year in jail. Harrison read Brenner's statement to Weaver and stated that if Weaver did not work with the police it would be very hard on his family. Weaver denied Brenner's accusation several times, and Harrison continuously responded "This is fact," each time in a louder voice, slapping the paper with his hand loudly.

Investigator Holt falsely told Weaver that a former student of Weaver's had signed a statement that he had the same relationship with Weaver as Brenner claimed to have had. The same officer also said there were other boys whom the police had spoken with who said the same thing. Officer Harrison reinforced this by telling Weaver he fit within the profile of a pedophile, and that the only reason he had been a scoutmaster was because he needed young boys. Officer Holt stated that Weaver's action had resulted in Brenner's attempted suicide. When Weaver attempted to provide the two interrogators with the names of other people who would support him, he was ignored. Officer Harrison told Weaver that it was an undisputed fact that Weaver had slept with Brenner on March 25, 1984 and Weaver admitted that they were on the same bed, although he denied that anything improper had taken place. The officer continued to insist that Brenner's statement was fact and demanded that Weaver recognize it as such.

Review of this record leads us to conclude that there are genuine issues of material fact as to whether defendants engaged in the alleged coercive conduct. Since defendants hotly dispute plaintiff's allegations, a factual determination of their conduct is needed to resolve the issue of qualified immunity. Thus, the order denying summary judgment on this issue is not final. Consequently, we must dismiss this portion of the appeal.

## IV  Cross–Appeal

Weaver seeks review of the district court's partial grant of summary judgment in favor of defendants based on a finding of qualified immunity for the false arrest and malicious prosecution causes of action. While acknowledging that an order partially granting summary judgment is interlocutory and thus generally not immediately appealable, plaintiff asks us to exercise our discretion to entertain his cross-appeal under the doctrine of pendent jurisdiction. Since we have exercised jurisdiction over an issue in this case, we may consider other nonappealable issues in our discretion, if the appealable and nonappealable issues sufficiently overlap to warrant our exercising plenary

authority over the appeal. *See San Filippo v. U.S. Trust Co.,* 737 F.2d 246, 255 (2d Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). We also avoid the waste of scarce judicial resources and exercise discretion to hear pendent interlocutory orders when failure to do so may leave an entire district court judicial proceeding full of error. *See McCowan v. Sears, Roebuck & Co.,* 908 F.2d 1099, 1104 (2d Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 250, 112 L.Ed.2d 209 (1990).

■ Plaintiff does not contend that the dismissal of his false arrest and malicious prosecution causes of action is likely to infect the proceedings on his Fifth and Fourteenth Amendment claims with error. Rather, he maintains there is a significant overlap in law and facts pertinent to the appeal and the cross-appeal. Such overlap, if any, is not sufficient to justify departing from the normal rules that pertain to appellate review. We have already determined the only appealable issue before us is whether plaintiff's Fifth and Fourteenth Amendment rights to be free from in-custody police coercion designed to extract an incriminating statement were clearly established in 1989. To resolve this issue requires a legal inquiry totally separate and distinct from that necessary to resolve the issue plaintiff wishes us to address, *i.e.,* whether it was objectively reasonable to believe there was probable cause to arrest him.

Nor is there significant overlap in the facts relevant to each inquiry present. The Fifth and Fourteenth Amendment causes of action concern only the facts surrounding the February 21, 1989 interrogation of plaintiff by the defendant investigators of plaintiff. In contrast, the reasonableness of defendants' beliefs that there was probable cause to arrest and prosecute plaintiff depends upon consideration of a much broader set of circumstances. Since there is no intertwining of the factors relevant to the appealable and nonappealable issues, we decline to exercise discretion to review plaintiff's cross-appeal and therefore dismiss it as a non-final order.

## CONCLUSION

For the foregoing reasons, the order denying defendants' motions for summary judgment based on qualified immunity for plaintiff's claims under the Fifth and Fourteenth Amendments, to the extent that it found the relevant rights to have been clearly established in 1989 is affirmed. To the extent the same order may be read as denying defendants' motions for summary judgment based on the objective reasonableness of their conduct, the order is non-final because unresolved questions of fact remain. To that extent the appeal must be dismissed. Plaintiff's cross-appeal is dismissed.