**Lawrence HANRAHAN, Administrator of the estate of Daniel Hanrahan, Plaintiff,**

**v.**

**CITY OF NORWICH, et al., Defendants.**

**No. 3:93CV2386 (RNC).**

United States District Court, D. Connecticut.

Feb. 25, 1997.

A. Paul Spinella, David K. Jaffe, Christian J. Moran, Law Offices of A. Paul Spinella, Hartford, CT, for Plaintiff.

Ralph U. Bergman, Norwich CT, for Defendants.

### RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CHATIGNY, District Judge.

In December 1991, Norwich police officer Daniel Hanrahan committed suicide with his service revolver after being questioned about his suspected involvement in a hit and run accident by Deputy Police Chief Robert Brautigam. Hanrahan's father, acting as administrator of his son's estate, brings this civil rights action under 42 U.S.C. § 1983, claiming that Brautigam violated the Due Process Clause of the Fourteenth Amendment by questioning Hanrahan without taking precautions to protect Hanrahan against a risk of self-inflicted harm.[1] Suit is also

---

1. Plaintiff claims that Brautigam should have confiscated Hanrahan's service revolver and provided him with access to a counselor, union representative or attorney. Plaintiff has designated two persons as expert witnesses who would testify in support of these claims at trial if

brought against Norwich Police Chief Richard Abele and the City of Norwich on the ground that they violated Hanrahan's due process rights by failing to adequately train Brautigam and other officers in suicide prevention.

Brautigam and Abele have moved for summary judgment on the grounds that they did not violate Hanrahan's due process rights and are entitled to the protections of qualified immunity. The City has moved for summary judgment on the ground that the evidence is insufficient to support a finding that Hanrahan's death was caused by deliberate indifference on the part of the City to the needs of its police officers.

The thrust of plaintiff's opposition to summary judgment is that the defendants are liable for failing to prevent Hanrahan's suicide, even though he did not appear to be suicidal, because suicide precautions should be taken whenever a police officer is under investigation for suspected wrongdoing and faces possible loss of his position. Even assuming suicide precautions should have been taken in this case as a matter of prudence, plaintiff's § 1983 claims do not warrant a trial because he alleges at most only negligence, which does not violate the Due Process Clause. Accordingly, the defendants' motion for summary judgment is granted.[2]

### 1. Background

On November 30, 1991, Shawn Murphy informed Norwich police that his car had been involved in a hit and run accident with another vehicle. Murphy and his passenger, John Blake, described the other vehicle as a white Camaro. Both Murphy and Blake had previously been arrested by Officer Hanrahan on charges relating to illegal drugs.

Four days later, Blake contacted the Norwich police and reported that he thought he had located the Camaro. The vehicle Blake described was registered to Hanrahan. That evening, Hanrahan's supervisor, Sergeant Kenneth Simoneau, called Hanrahan at home. Hanrahan denied being involved in a hit and run accident with another vehicle but stated that he had recently been involved in an accident with his car. He told Simoneau he would bring the car to work the next day.

The next morning, Hanrahan telephoned Simoneau at home and said he was having trouble starting his car. Hanrahan swore repeatedly, which was out of character for him, and told Simoneau he could come to the house, look at the car and take pictures of it. Simoneau picked up Hanrahan and gave him a ride to work, apparently without looking at Hanrahan's car. Simoneau has testified that Hanrahan was unusually quiet and seemed apprehensive.

At about 9:00 a.m., Brautigam, Simoneau and Hanrahan drove together to Hanrahan's house to inspect and photograph Hanrahan's car. Simoneau examined the car and Brautigam took samples of paint chips and fiberglass. Hanrahan stated that the car had been damaged striking a guardrail and directed the others to a location where he claimed the collision with the guardrail had occurred. Brautigam and Simoneau inspected the guardrail and surrounding area. Finding no evidence of an accident, Simoneau told Hanrahan, "Dan, this doesn't look good." The three then returned to the police station, arriving at about 10:20 a.m.

At 10:45 a.m., Brautigam, Simoneau and another officer met in Brautigam's office to discuss the situation. All three expressed a belief that Hanrahan had been involved in

permitted to do so. *See* Aff. of John Violanti, dated 9/20/96, Ex. 10 to Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. (hereinafter "Violanti Affidavit") (Hanrahan should have been allowed to speak with someone before he was questioned by Brautigam); Aff. of Larry F. Jetmore, dated 10/14/96, Ex. 14 to Pl.'s Revised Mem. in Opp. to Defs.' Mot. for Summ. J. (hereinafter "Jetmore Affidavit") (Brautigam should have provided Hanrahan with a counselor or union representative and should have located and removed Hanrahan's weapon).

2. Plaintiff has also sued all three defendants on a number of state law claims, including claims under the Connecticut Constitution. Because the § 1983 claims are being dismissed prior to trial, exercising supplemental jurisdiction over the state law claims would not be appropriate. Accordingly, those claims are dismissed without prejudice.

the hit and run accident reported by Murphy and should be given the warnings prescribed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the conclusion of the meeting, which lasted about 15 minutes, Brautigam told Simoneau to send Hanrahan to his office.

Hanrahan entered Brautigam's office at about 11:15 a.m. Brautigam spoke with Hanrahan in private for approximately fifty minutes. The two sat opposite each other at Brautigam's desk. Brautigam did not give Hanrahan any *Miranda* warnings.

During the course of the fifty minute session, Brautigam told Hanrahan that his story about hitting the guardrail was not believable; that if he was protecting someone else, he should say so; and that he should not let the incident ruin his career. Toward the end of the session, Hanrahan said he would resign. Brautigam turned away from Hanrahan to get a piece of paper to prepare the resignation. Hanrahan then shot himself before Brautigam could stop him.

Hanrahan was the first member of the Norwich police department to commit suicide. In the year before his death, Hanrahan had certain personal problems involving former girlfriends. Hanrahan told Simoneau about his personal problems but Simoneau never told anyone else. At the time of Hanrahan's death, the Norwich police department did not have any programs, policies or procedures for preventing suicide by police officers undergoing investigation or facing possible loss of their employment due to suspected wrongdoing.[3]

## 2. Discussion

### a. The Claim Against Brautigam

Plaintiff's claim against Brautigam is premised on the theory that there was a "special relationship" between Brautigam and Hanrahan, which required Brautigam to take precautions to protect Hanrahan against self-inflicted harm.[4] In *DeShaney v. Winnebago County Dep't of Social Serv.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court stated that the Due Process Clause does not impose a duty on state officials to protect an individual against a risk of violence unless there is a "special relationship" between the state and the individual, such as the relationship that occurs when a state takes a person into custody. The Court stated:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

489 U.S. at 200, 109 S.Ct. at 1005. Plaintiff contends that Brautigam's interaction with Hanrahan involved a "restraint of personal liberty" within the meaning of *DeShaney.*[5]

Whether the "special relationship" required by *DeShaney* existed between Brautigam and Hanrahan appears to be a question of first impression. When Brautigam undertook to question Hanrahan about his suspected involvement in the hit and run accident reported by Murphy, the "process" guaranteed to Hanrahan by the Fourteenth Amendment might have imposed an obligation on Brautigam to satisfy certain minimal standards applicable to custodial interrogation. On the other hand, Brautigam had a right to interview Hanrahan in connection with his employment as a police officer and it is

---

3. It is undisputed that the police department did provide officers with some information and training regarding stress management. *See* Dep. of Al R. Fecteau, dated 9/25/96, at 23, Ex. 15 to Pl.'s Revised Mem. in Opp. to Defs.' Mot. for Summ. J.

4. Plaintiff previously claimed that Brautigam shot Hanrahan either deliberately or during a struggle. However, that claim has been withdrawn.

5. Plaintiff does not rely on Hanrahan's status as a municipal employee. *See Collins v. Harker Heights,* 503 U.S. 115, 130, 112 S.Ct. 1061, 1071, 117 L.Ed.2d 261 (1992) (Due Process Clause of Fourteenth Amendment does not impose independent federal obligation on municipal employers to provide certain minimal levels of safety and security in workplace).

doubtful that a supervisor's interview of a subordinate constitutes a "restraint on personal liberty" within the meaning of that phrase as it was used by the Court in *DeShaney*.

In any event, there is no need to decide whether Hanrahan had a "special relationship" with Brautigam within the meaning of *DeShaney* because, even if Hanrahan was in custody during the interview in Brautigam's office, Brautigam is entitled to summary judgment.

A person in state custody has a right under the Due Process Clause to some level of care and protection, including protection against suicide. *See Hare v. City of Corinth,* 74 F.3d 633, 647 and n. 3 (5th Cir.1996) (collecting cases involving claims of failure to prevent suicide by pretrial detainees). However, negligent inaction by a custodial official does not violate the Due Process Clause. *See Daniels v. Williams,* 474 U.S. 327, 332–33, 106 S.Ct. 662, 665–66, 88 L.Ed.2d 662 (1986) (due process protections of Fourteenth Amendment are not triggered by lack of due care on the part of prison officials). To prove a due process violation based on an act or omission of a custodial official, it must be established that the official acted in reckless disregard of a substantial risk to the detainee's health or safety because of deliberate indifference to the detainee's needs. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996).[6]

The Second Circuit has stated that whether an official knew or should have known of a substantial risk to a detainee's health or safety is usually a question of fact for the jury. *Id.* at 856. In this case, however, there is no evidence that Hanrahan threatened to commit suicide or exhibited any signs or symptoms of emotional disturbance that would put Brautigam on notice of a risk Hanrahan might try to take his own life. *See Liscio v. Warren,* 901 F.2d 274, 276–77 (2d Cir.1990) (physician "on notice" detainee might be suffering from alcohol withdrawal). Accordingly, no reasonable juror could find that Brautigam knew or should have known of a substantial risk that Hanrahan might commit suicide.[7]

Plaintiff argues that Brautigam can be held liable for failing to take precautions to prevent Hanrahan's suicide, even though he had no reason to believe Hanrahan was suicidal, on the ground that police officers as a group are more likely to commit suicide than people in other occupations, especially when faced with the possibility of losing their jobs. In other words, plaintiff contends that because police officers as a group face an increased risk of committing suicide when they are in trouble at work, Brautigam should have taken precautionary measures in dealing with Hanrahan as a matter of prudence. Accepting these allegations as true, they are insufficient to support a due process claim against Brautigam because all they show is

**6.** The Second Circuit has not decided whether, in the context of a § 1983 due process claim against a state official based on his or her acts or omissions, the appropriate standard for assessing deliberate indifference is a subjective or objective one. *See Weyant,* 101 F.3d at 856. Other circuits have decided that a pretrial detainee's due process claim for denial of adequate medical care should be governed by the same standard of subjective deliberate indifference approved by the Supreme Court in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), for claims of sentenced prisoners alleging a denial of medical care in violation of the Eighth Amendment. *See Hare,* 74 F.3d at 648–49; *Sanderfer v. Nichols,* 62 F.3d 151, 154–55 (6th Cir.1995); *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). This standard precludes individual liability unless the custodial official actually knew of a substantial risk that the detainee

might commit suicide and violated the detainee's rights by responding with deliberate indifference.

**7.** A review of § 1983 cases discloses no case in which a claim against a custodial official for failure to prevent the suicide or attempted suicide of a person in the official's custody was tried to a jury in the absence of evidence that the official knew the person for whom he was responsible had threatened to commit suicide, displayed suicidal tendencies or exhibited other symptoms of emotional disturbance showing a vulnerability to suicide. *See, e.g., Estate of Cole v. Fromm,* 94 F.3d 254, 261 (7th Cir.1996); *Estate of Hocker v. Walsh,* 22 F.3d 995, 1000 (10th Cir.1994); *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1539–40 (11th Cir.1994); *Elliott v. Cheshire County,* 940 F.2d 7, 11 (1st Cir.1991); *Buffington v. Baltimore County,* 913 F.2d 113, 119–20 (4th Cir.1990).

negligence, which is not actionable under § 1983.[8]

As an alternative to his due process claim based on Brautigam's failure to protect Hanrahan against suicide, plaintiff claims that Brautigam violated Hanrahan's right to due process by engaging in conduct that made it more likely Hanrahan would commit suicide. Plaintiff does not contend that Brautigam was physically abusive or drove Hanrahan to kill himself. Rather, he challenges Brautigam's failure to provide Hanrahan with the warnings prescribed by *Miranda*, in particular, the warning concerning the right to consult with counsel.[9]

State action that creates dangers or renders a person more vulnerable to harm may provide a basis for a due process claim in some circumstances. *See Soto v. Flores*, 103 F.3d 1056, 1063–64 (1st Cir.1997); *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir.1996); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993). Moreover, use of coercive methods to overcome a suspect's will and produce a confession violates due process. *See Weaver v. Brenner*, 40 F.3d 527, 537 (2d Cir.1994); *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir.1992) (in banc). However, there is no evidence that Brautigam engaged in the type of abusive conduct at issue in *Weaver* or *Cooper*, and a claim based solely on an officer's failure to comply with *Mi-*

*randa* does not state a cause of action under § 1983. *See Bennett v. Passic*, 545 F.2d 1260, 1263 (10th Cir.1976); *O'Hagan v. Soto*, 523 F.Supp. 625, 629 (S.D.N.Y.1981); *Hampton v. Gilmore*, 60 F.R.D. 71 (E.D.Mo.1973), *aff'd*, 486 F.2d 1407 (8th Cir.1973).

Because there is no evidence that the manner in which Brautigam conducted his interview of Hanrahan was so improper as to violate Hanrahan's right to due process, plaintiff's claim that Brautigam violated due process by engaging in conduct that made it more likely Hanrahan would commit suicide is the functional equivalent of his claim that Brautigam violated due process by failing to protect Hanrahan against suicide. As such, it is governed by the same deliberate indifference standard. *See Kneipp*, 95 F.3d 1199, 1208 and n. 21. Applying that standard, the claim is insufficient as a matter of law for lack of evidence that Brautigam knew or should have known of a substantial risk Hanrahan might try to harm himself.[10]

b. The Claim Against Abele

Plaintiff claims that Abele is liable for Hanrahan's death because he failed "to promulgate and enforce appropriate guidelines, regulations, policies, practices, procedures or customs regarding suicide risk assessment and suicide prevention by members of the

---

**8.** Plaintiff's claim that Brautigam is liable for Hanrahan's death, even though Hanrahan did not appear to be suicidal, is based on the Violanti and Jetmore affidavits. The Violanti affidavit states that studies of police suicide conducted after 1986 show that police officers have a "significantly increased risk of suicide compared to other similar working groups" and that, if a police department had conducted a review of such studies in 1991, "it would have discovered the extent of the problem of police suicide." Violanti aff. ¶¶ 5–6. The Jetmore affidavit states that "[i]t was well known in 1991 that police officers, especially when their job is threatened, are more susceptible to suicide than similar other professional groups." Jetmore aff. ¶ 9e. Notably, neither affidavit offers any citation to any published study of police suicide that might have been available in 1991 or that is available today and no such study has been included in the record. Moreover, neither affidavit offers any proof that any police department has ever adopted policies or procedures to prevent suicide by police officers who are the subjects of internal investigations or criminal investigations or who

face a risk of losing their jobs due to suspected wrongdoing.

**9.** The Jetmore affidavit states that "[t]he police department, especially Deputy Chief Brautigam, should have been sensitive to the pressure on Daniel Hanrahan and provided him with . . . his *Miranda* rights." Jetmore aff. ¶ 9.g.

**10.** Because the evidence does not support a finding that Brautigam violated Hanrahan's due process rights, it is unnecessary to discuss his defense of qualified immunity at any length. However, Brautigam is clearly entitled to the protections of qualified immunity. A reasonable officer in Brautigam's position could have believed that Brautigam's conduct toward Hanrahan did not violate Hanrahan's due process rights. *See Heggs v. Grant*, 73 F.3d 317, 321 (11th Cir.1996) (officer who allegedly failed to prevent suicide by detainee protected by qualified immunity because no clearly established law required him to take further measures to protect detainee).

City of Norwich police department" and failed to adequately train Brautigam and other police officers "in the proper methods to be used in suicide risk counseling, identification assessment . and prevention." Complaint, Count Nine, ¶¶ 19.c and 19.f(v). Abele contends that he cannot be held personally liable on this claim because he is protected by qualified immunity. I agree.

■ The doctrine of qualified immunity protects officials engaged in the performance of discretionary functions to the extent their conduct does not violate clearly established constitutional or statutory rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Plaintiff cites no case, and none has been found, that required Abele to promulgate policies and provide training for prevention of suicide by police officers. Moreover, there is no evidence in the record that any police department ever did more than the City of Norwich to prevent police suicide either before or after Hanrahan's death. On this record, plaintiff's claim against Abele alleges at most only negligent conduct, which is insufficient to overcome an official's qualified immunity under § 1983.[11]

### c. The Claim Against the City

■ Plaintiff contends that the City is liable for Hanrahan's death on the theory that it failed to properly train its police officers in detecting and preventing potential suicides. Plaintiff contends that the City may be held liable because it was generally known in 1991 that police officers as a group face a higher risk of suicide than others and appropriate training in suicide prevention would have prevented Hanrahan's death.

■ In some circumstances, a municipality may be liable under § 1983 for constitutional violations resulting from its failure to train municipal employees. *City of Canton v. Harris,* 489 U.S. 378, 380, 109 S.Ct. 1197, 1200, 103 L.Ed.2d 412 (1989). Inadequate training of police officers provides a basis for municipal liability when the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality ... can a city be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. at 1205.

To establish liability on the part of the City for failing to train its officers in suicide prevention, plaintiff has the burden of proving that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the City can reasonably be said to have been deliberately indifferent. *Id.* at 390, 109 S.Ct. at 1205. Plaintiff has not sustained that burden. It is undisputed that no Norwich police officer ever committed suicide or attempted to commit suicide before the tragic death in this case.

Plaintiff argues that it would be "anomalous" to permit the City to escape liability on the ground that Hanrahan's death was the first suicide by a police officer in Norwich. Pl's. Rev'd Mem. in Opp. To Defs.' Mot. for Summ. J. at 40. Plaintiff might be able to establish liability on the part of the City based on police suicides elsewhere if the experience in other jurisdictions made it obvious that more training was needed in Norwich. *See Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992). However, the affidavits of plaintiff's proposed experts fall far short of providing a sufficient evidentiary basis for that theory of liability.[12]

---

11. In opposing summary judgment, plaintiff argues that Abele is personally liable for Hanrahan's death under § 1983 because he failed to take steps to confiscate Hanrahan's weapon or provide him with access to a counselor. No such claim appears in the complaint. Moreover, although Abele knew Hanrahan was going to be interviewed in connection with the hit and run accident reported by Murphy, there is no evi-

dence that he had any contact with Hanrahan on the day of Hanrahan's death or had any reason to believe that Hanrahan was a suicide risk. Accordingly, the § 1983 claim against Abele in his personal capacity is properly dismissed.

12. All plaintiff offers in support of his "failure to train" claim is the Jetmore affidavit, which states: "The training provided to Deputy Chief

Plaintiff has presented no proof concerning the number of police suicides in other jurisdictions, the circumstances in which the suicides occurred or the policies and procedures of other police departments for preventing police suicide. On this record, no reasonable juror could find that the City failed to train its police officers in suicide prevention, despite an obvious need for more training, because of deliberate indifference to the need.

Plaintiff's claim against the City also fails because there is insufficient evidence to permit a finding that a properly trained officer would have recognized that Hanrahan might try to commit suicide. *See Manarite v. City of Springfield,* 957 F.2d 953, 959 (1st Cir.1992); *Dorman v. District of Columbia,* 888 F.2d 159, 165 (D.C.Cir.1989). Plaintiff alleges that Simoneau's knowledge of Hanrahan's personal problems and unusual behavior on the morning of his death should have been conveyed to other officers.[13] However, there is no evidence in this record that a properly trained officer, knowing what Simoneau knew, would have recognized that Hanrahan was suicidal. Accordingly, summary judgment for the City is appropriate:

### 3. Conclusion

Accordingly, defendants' motion for summary judgment is hereby granted.

So ordered.

Brautigam, Sergeant Simoneau and *Chief Abele* may have been deficient in not adequately informing these officers that police officers have an increased risk of suicide, or that certain precautionary techniques should be practiced when criminal interrogations, especially those directly threatening the job of an officer are conducted." Jetmore Aff. ¶ 9.i.

**13.** *This claim appears to be based on a conclusory statement in the Jetmore affidavit that Simoneau's information concerning Hanrahan's state of mind should have been conveyed to "appropriate persons." Jetmore Aff. ¶ 9.f.*