Joanne **NIEMANN**, Plaintiff,

v.

William **WHALEN**, sued in his official and individual capacities, and Fleet Bank, Defendants.

No. 93 Civ. 7576 (WCC).

United States District Court, S.D. New York.

Jan. 2, 1996.

Law Offices of Michael H. Sussman, for Plaintiff, Goshen, NY, Stephen Bergstein, of counsel.

Dennis C. Vacco, Attorney General for the State of New York, Department of Law, New York City, for Defendant William Whalen, Carolyn Cairns Olson, of counsel.

Wilson, Bave, Conboy, Cozza & Couzens, P.C., White Plains, New York, for Defendant Fleet Bank, Michael J. Cozza, of counsel.

WILLIAM C. CONNER, Senior District Judge:

Plaintiff Joanne Niemann has brought this action under 42 U.S.C. § 1983 against defendants William R. Whalen, a New York State Police Investigator, and Fleet Bank, plaintiff's former employer. Each defendant has moved for summary judgment on all claims. For the reasons set forth below, defendants' motions are granted in part and denied in part.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Fleet Bank hired plaintiff as a teller in February 1988. By June 1992, plaintiff had been promoted to the position of teller supervisor and assigned to the Grahamsville branch. Only four employees regularly worked in that branch: plaintiff, Penny Dean and Laurie Decker as tellers and Martha Ahrens as branch manager. On June 29, 1992, plaintiff worked a full day at the branch and, as teller supervisor, was responsible for the money in the bank's vault. Plaintiff and Dean counted the money in the vault at the end of the day. They did not report a discrepancy.

On June 30, 1992, plaintiff called the branch to inform her co-workers that she would not be coming in that day, allegedly because one of her children was sick. Ahrens also did not go to work that morning. Cindy Balanovich, a floating branch manager, took over for Ahrens. According to standard bank procedure when the teller in charge of the vault changes, Balanovich and Decker counted the money in the vault. They discovered a bundle of twenty dollar bills that was smaller than all of the other bundles of twenties, which contained $10,000 each. When Balanovich and Decker counted the short bundle, they ascertained that $3,220 was missing. Standard bank procedure requires that a bundle of bills be marked with the stamp of the teller who put the bundle together, the date of that count and the initials of the teller. The short bundle was stamped with Dean's teller stamp and dated

June 23, 1992, but had not been initialled by anyone.

Upon discovering that the money was missing, Balanovich called Frank Connelly, the assistant security officer for Fleet Bank. Connelly contacted George Whitmore, the district manager responsible for the Grahamsville branch, and then went to the branch to question Dean, Decker and Balanovich. Each of them denied knowing anything about the missing money. Fleet Bank reported the loss to the State Police on June 30, and Whalen was assigned to investigate. Shortly thereafter, he spoke to Whitmore and Connelly concerning the investigation that the bank had done up to that point.

Plaintiff remained home from work on July 1, but reported to the branch on July 2. Ahrens told her that Whitmore wanted to see her at the bank's branch office in Liberty. When plaintiff arrived at Whitmore's office, he told her that she was being placed on a paid leave of absence. According to plaintiff, he explained that the purpose of the leave was to care for her daughter. According to Whitmore, he told plaintiff that she was being placed on leave because she had been responsible for the vault immediately prior to the discovery of the discrepancy. Later that day, Whitmore and Connelly scheduled a meeting with Niemann at the Liberty branch for the next day. Connelly notified Whalen and asked him to be present. According to plaintiff, Whitmore told her that she needed to come to Liberty to look over some memoranda concerning her impending transfer to a Fleet Bank branch in Saratoga.[1] Whitmore testified at his deposition that he could not remember exactly what he told plaintiff about the purpose of the meeting, but that he believed he told her that it concerned the problems at the Grahamsville branch.

Plaintiff arrived at the Liberty branch on the morning of July 3 with her children. Whitmore told her that he was not yet ready to proceed and that she should take the children to a sitter and then go home to wait for him to call her. After receiving a call

---

1. Plaintiff had previously requested this transfer for personal reasons and was planning to begin work in Saratoga on July 6. According to plain-

tiff, the other employees in the Grahamsville branch were aware of her plans.

from Whitmore indicating that she should return, plaintiff arrived at the Liberty branch about 11 a.m. to find Whalen and Connelly with Whitmore in his office. At Connelly's request, Niemann went into a nearby conference room to wait. About twenty minutes later, Whalen and Connelly entered the room. Whalen was in plain-clothes.

What happened next is hotly disputed. The conflicting versions presented here are taken from transcripts of the depositions of the individuals concerned and from an affidavit submitted by plaintiff.

Plaintiff contends that Connelly introduced Whalen to her as "a friend of mine" and that Whalen then gave her his name, but did not inform her that he was a police officer. She states that Connelly controlled the ensuing interview and that he pressured her to admit that she had taken the money from the branch despite her denial of any involvement in or knowledge of the theft. He allegedly threatened that if she did not confess, he would tell her husband's employer that her husband helped her steal the money, have her house searched in front of her children, have her "sent away" and have her children taken away from her. Plaintiff asserts that Connelly called Balanovich into the room with a bundle of money that he claimed was the short bundle from the vault and tried to get plaintiff to touch the money. She states that Connelly refused to allow her to leave the room, to use the phone or to speak to a lawyer. She claims that Connelly was cursing and yelling and that at one point he slammed his fists down on the table when he said that she could not leave. According to plaintiff, Connelly told her that the bank simply needed someone to confess but that she would not be arrested or prosecuted if she did so. Plaintiff asserts that throughout the questioning, Connelly would turn to Whalen to seek confirmation that they could follow through on his threats, and Whalen would agree. At about 2:45 p.m., plaintiff agreed to confess. Whalen typed out a confession that plaintiff maintains she signed without reading. She left the Liberty office immediately thereafter. She contends that she is certain of the time because part of the

Liberty branch office was closed for the day when she left.

Defendants present very different versions of the questioning. According to Whalen, Whitmore introduced him to Niemann as a state police officer. Whalen asserts that at the beginning of the interview, he displayed his police credentials and read plaintiff her *Miranda* rights. He and Connelly then questioned plaintiff, with Connelly doing most of the talking. Whalen states that neither he nor Connelly threatened Niemann in any way, that she never asked to leave the room, that she could have left at any time she wished to, that she never asked to use a telephone or to speak to a lawyer and that no one promised her that she would not be prosecuted if she confessed. He claims that after about an hour and fifteen minutes of questioning, plaintiff confessed to taking the money. He then typed the confession. Plaintiff read it, made one correction and then signed it. He asserts that she left about 12:15 or 12:30 p.m. According to Whalen, plaintiff stated that she took the money because she needed it to make a down payment on a house.

Connelly's account of the questioning session differs from Whalen's on certain points. Connelly agrees with Whalen that Whitmore was present when Niemann arrived, but that only Connelly, Niemann and Whalen were in the room when Connelly began the questioning. Connelly states that he introduced Whalen to plaintiff and identified Whalen as a police officer. According to Connelly, he informed Niemann that she was being questioned about the missing money. He states that she confessed ten or fifteen minutes after the interview began. Connelly asserts that Whalen informed plaintiff of her *Miranda* rights at the time that she indicated she would confess. Like Whalen, Connelly claims that no one threatened plaintiff in any way, that she never asked to leave the room and that she never asked to use the phone or to speak to a lawyer. Connelly maintains that he never promised plaintiff that she would not be prosecuted if she confessed. Connelly states that he saw plaintiff read and sign the confession that Whalen had typed for her, although he did not remember seeing

her make any corrections. He asserts that plaintiff explained that she took the money for a down payment on a house and that she offered to pay it back to the bank. He estimates that the entire interview session lasted forty-five minutes.

The parties do not dispute that plaintiff left the bank shortly after signing the confession and went home. According to Whalen, Whitmore called Whalen on July 8 and indicated that the bank wanted to press charges against Niemann. Whalen took supporting depositions from Whitmore and Dean and completed a felony information charging Niemann with grand larceny in the third degree.[2] Whalen and Niemann made arrangements for her to surrender herself on July 9. She went to the police barracks that morning to be fingerprinted and photographed. Whalen then drove her to the chambers of the Town Justice, where she was arraigned and released on a personal recognizance bond. Plaintiff pled not guilty. On July 21, 1993, on plaintiff's motion and without opposition from the District Attorney, the Town Justice dismissed the charge against plaintiff on the ground that the District Attorney had failed to prosecute the case in a timely fashion.

Plaintiff filed this § 1983 action on November 3, 1993. Plaintiff contends that Whalen, acting as an individual and in his official capacity, and Fleet Bank, acting through its employees, conspired to falsely imprison, falsely arrest and maliciously prosecute plaintiff in violation of her constitutional rights. Plaintiff also alleges that defendants conspired to coerce her confession. Defendants deny that plaintiff was threatened or coerced in any way and assert that their actions in interviewing, arresting and prosecuting plaintiff were lawful and reasonable under the circumstances. In addition, defendant Whalen argues that he is entitled to the protection of qualified immunity. Defendants have moved for summary judgment on all of plaintiff's claims.

## DISCUSSION

■ Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has explained that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those [materials] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In order to defeat summary judgment, the nonmoving party must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" Id., at 324, 106 S.Ct. at 2553. No genuine issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. See Anderson, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. In evaluating whether a genuine question of material fact exists, however, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id., at 255, 106 S.Ct. at 2513.

### I. Section 1983

■ In order to maintain an action under 42 U.S.C. § 1983, two essential elements must be present. The conduct complained of must have been committed by a person acting under color of state law and must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. See Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir.1994). We will address each of these elements in turn.

---

**2.** That crime is defined as the theft of property worth more than three thousand dollars. See N.Y.Penal Law § 155.35.

■ First, however, we note that plaintiff has brought claims seeking money damages against Whalen in his official capacity as a member of the New York State Police, as well as in his individual capacity. Plaintiff's § 1983 claims against Whalen in his official capacity are barred by the Eleventh Amendment. *See Eng v. Coughlin,* 858 F.2d 889, 896–97 (2d Cir.1988). Furthermore, the Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Hence, this court has no subject matter jurisdiction over plaintiff's claims against Whalen in his official capacity. Plaintiff has conceded this point, and does not oppose the dismissal of these claims. *See* Plaintiff's Memorandum of Law, at 1 n. 1. Accordingly, we grant defendant Whalen's motion for summary judgment dismissing the claims against him in his official capacity.

## A. Actions Under Color of State Law

We now turn our attention to evaluating plaintiff's claims against Whalen in his individual capacity and against Fleet Bank. Defendant Whalen does not challenge plaintiff's contention that he acted under color of state law during the events at issue here. Defendants argue, however, that plaintiff has produced no evidence that indicates that Fleet Bank's employees were also acting under color of state law.

■ A private defendant may only be held liable under § 1983 as "a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Therefore, in order to recover from a private defendant, a § 1983 plaintiff must demonstrate that the private defendant collaborated or conspired with a person acting under color of state law to violate the plaintiff's constitutional rights. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995). The plaintiff bears the burden of proof on this issue, *see Scheiner v. Wallace,* 860 F.Supp. 991, 999 (S.D.N.Y.1994), and must produce more than conclusory allegations or naked assertions of joint or conspira-

torial action. *See Doe v. Smith,* 704 F.Supp. 1177, 1188–89 (S.D.N.Y.1988). In order to defeat summary judgment, the plaintiff must set forth evidence of specific facts tending to show concerted action. *See id.*

None of the parties disputes that the bank's employees were acting as agents of defendant Fleet Bank throughout the events at issue here. Therefore, if Whalen agreed to act in concert with any bank employee and that conduct violated plaintiff's constitutional rights, plaintiff may bring a § 1983 action against defendant Fleet Bank. Plaintiff has alleged such a conspiracy. *See* Complaint, at I. Defendants contend, however, that plaintiff has not identified any specific evidence that Whalen conspired with any bank employee to act unlawfully. Defendants argue that plaintiff has, at most, advanced a speculation that Connelly and Whalen reached an agreement in the twenty minutes before they began questioning her.

■ Defendants are correct that plaintiff has not put forward any direct evidence of an agreement between Whalen and any bank employee to take action that would violate her constitutional rights. A conspiracy claim under § 1983 may, however, be proven by circumstantial evidence. *See House v. Belford,* 956 F.2d 711, 721 (7th Cir.1992) (citing *Hampton v. Hanrahan,* 600 F.2d 600, 621, 623 (7th Cir.1979)). Plaintiff has asserted that Whitmore asked her to come to the Liberty branch office under false pretenses and that when she arrived, Connelly, Whalen and Whitmore were all present in Whitmore's office. Plaintiff was then asked to wait in a separate room with the door closed for twenty minutes. Plaintiff has also testified that throughout the questioning period:

> [Connelly] kept threatening he was going to drag me through the mud, my kids through the mud. My husband, he was going to ruin his job and make sure I was sent away. If I did not agree to this, I would be sorry. And, he kept saying to Mr. Whalen, "Isn't it true? Can't we do that?" And, he would agree.

Transcript of Deposition of Joanne Niemann, dated June 20, 1994, at 125; *see also* Affida-

vit of Joanne Niemann, dated August 2, 1995, at ¶ 13. Plaintiff has also stated that Whalen and Connelly told her that she could not leave the conference room until she signed a confession. Plaintiff has therefore presented specific factual allegations, supported by her affidavit and references to her sworn deposition testimony, that tend to show, by way of circumstantial evidence, the identity of the alleged conspirators, the time when the alleged agreement was reached, the object of the alleged conspiracy and the method by which the alleged conspirators sought to achieve their goal.

Whalen, Connelly and Whitmore dispute plaintiff's account of the interview. Whitmore has stated that he believes that he informed plaintiff that he was asking her to come to the Liberty branch to discuss the missing money. Whalen and Connelly have asserted that they did not make the remarks that plaintiff has attributed to them. Both have denied reaching an agreement to take any action that would deprive plaintiff of her constitutional rights.[3]

■ This conflicting deposition testimony is the only evidence before us concerning what occurred prior to and during the interview. On summary judgment, we may not resolve issues of credibility. Drawing all justifiable inferences in plaintiff's favor, we find that plaintiff has demonstrated that a genuine question of material fact exists regarding whether Whalen conspired or collaborated with bank employees to act in a manner that violated her constitutional rights.

Furthermore, Whalen has asserted that he decided to arrest plaintiff and to charge her with grand larceny upon being informed by Whitmore that the bank wished to press charges. Whitmore and Dean completed supporting depositions that were filed with the felony information charging plaintiff. Hence, there is evidence before us from which a reasonable jury could conclude that agents of defendant Fleet Bank agreed to act jointly with Whalen in arresting and commencing the criminal prosecution of plaintiff.

### B. Alleged Constitutional Violations

Plaintiff has stated causes of action for false imprisonment, false arrest, and malicious prosecution in violation of § 1983. *See* Complaint, at ¶¶ 36–38. Plaintiff has also made factual allegations that support a § 1983 claim that Whalen and Connelly coerced her confession. *See id.*, at ¶¶ 10–16, 18–21, 26. Although the complaint does not specify which of plaintiff's constitutional rights were allegedly violated by Whalen and the bank employees' conduct, "it is only the violation of the constitutional right that is actionable and compensable under § 1983." *Singer*, 63 F.3d at 116. Therefore, we must identify the relevant constitutional right implicated by each of plaintiff's claims and evaluate the validity of those claims by reference to the specific constitutional standard which governs that right. *See id.* (citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989)).

#### 1. False Imprisonment and False Arrest

■ Plaintiff's claims for false arrest and false imprisonment implicate her Fourth Amendment right to be free from the unreasonable seizure of her person. *See Singer*, 63 F.3d at 115 (stating that plurality of Justices held in *Albright v. Oliver*, —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), that Fourth Amendment provides source for § 1983 claims based on person's arrest); *see also Lennon v. Miller*, 66 F.3d 416, 423 n. 2 (2d Cir.1995) (analyzing claims for false arrest under Fourth Amendment only). As the Second Circuit has recently explained, the Supreme Court has yet to define the scope of those Fourth Amendment rights in the context of § 1983 claims for false arrest, false imprisonment and malicious prosecution. *See Singer*, 63 F.3d at 115. The Second Circuit stated that a court addressing a claim for malicious prosecution must engage in two inquiries: "whether the defendant's conduct was tortious; and whether the plaintiff's injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment." *Id.*, at 116. Although the *Singer* court did

---

**3.** Whalen has admitted, however, that before he and Connelly began questioning Niemann, they discussed why they wanted Balanovich to be present for part of the interview. *See* Transcript of Deposition of William R. Whalen, dated July 27, 1994, at 26.

not explicitly state that it applied this analysis to the false arrest claim in that case as well, it dismissed that claim on the ground that there was probable cause for the plaintiff's arrest. *See id.*, at 118–19. As we read the Second Circuit's opinion, this disposition involved a finding under the first prong that the defendant's conduct was not tortious because it was supported by probable cause. We employ the same two-part reasoning in evaluating defendants' motions for summary judgment on plaintiff's claims for false arrest and false imprisonment.

Plaintiff has alleged violations of her Fourth Amendment rights both when she was allegedly detained by Whalen and Connelly for questioning and when she was subsequently formally arrested on the charge of grand larceny. Defendants argue that Whalen and the bank employees' conduct on both occasions was not tortious because there was probable cause to question plaintiff and to arrest her. To the extent that plaintiff's claims are based on the fact that she was interviewed, we agree. However, we believe that there is an issue of fact as to whether Whalen had probable cause to arrest plaintiff.

 "In determining whether an asserted defense is available to defeat liability in an action brought under § 1983, the courts have generally been guided in large part by whether the defense was available at common law." *Cameron v. Fogarty*, 806 F.2d 380, 386 (2d Cir.1986), *cert. denied*, 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). It is therefore well-settled in this Circuit that there can be no federal civil rights claim for false arrest where the authorities have probable cause for the arrest. *See Singer*, 63 F.3d at 118. It is also clear that a defendant faced with a § 1983 claim for false imprisonment may rely upon the defenses to a common law claim for false imprisonment, which include the existence of probable cause for the detention. *See Cameron*, 806 F.2d at 387; *see also Simpson v. Saroff*, 741 F.Supp. 1073, 1077 (S.D.N.Y.1990). Probable cause is established when "the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense

has been committed by the person to be arrested." *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989); *see also Singer*, 63 F.3d at 119. The existence of probable cause is determined based on the totality of the circumstances at the time of the arrest. *See Calamia*, 879 F.2d at 1032; *Landy v. Irizarry*, 884 F.Supp. 788, 795 (S.D.N.Y. 1995).

 Based on the undisputed facts known to Whalen and Connelly at the time they conducted their questioning of plaintiff, we find that they had probable cause to interview her concerning the missing money. By the day of the interview, Connelly had spoken with each of the other employees at the branch. He has stated that each of them had denied any involvement in taking the money or any knowledge of how the money was taken. Connelly's investigation, of which he informed Whalen before they began the interview with plaintiff, established that plaintiff, who was the teller in charge of the vault on June 29 and was responsible for any discrepancies, had counted the money in the vault with Dean at the close of business that day and had not reported any shortage. The short bundles were stamped with Dean's teller stamp but not initialled by anyone. Connelly had discussed this with Dean and she had told him that all of the other bundles bearing her teller stamp were properly initialled and that she had no idea how her teller stamp came to be on the short bundles.

Under these circumstances, Whalen and Connelly clearly had probable cause to call plaintiff in for questioning. The facts as they were understood by Connelly and Whalen at the time of the interview were based on reasonably trustworthy information gathered by Connelly in the course of his investigation and were sufficient for a reasonably cautious person to believe that plaintiff might have taken the money. Indeed, we note that plaintiff has conceded that defendants "had reason" to interview her about the discrepancy. *See* Plaintiff's Memorandum of Law, at 7–8. Therefore, we agree with defendants that Whalen and Connelly's actions in calling plaintiff in for the interview were not tortious. To the extent that plaintiff's claims for false arrest and false imprisonment are

based on the fact that she was interviewed, defendants are entitled to summary judgment dismissing those claims.

A brief comment on the question of constitutional injury is appropriate at this juncture, however. Plaintiff contends that although defendants had reason to question her in connection with the missing money, the manner in which Whalen and Connelly did so violated her constitutional rights because it was unreasonable under the circumstances for her to be subjected to a much longer, more intensive and more coercive questioning session than any other employee and to be pressured into making a false confession. As plaintiff has not specified which of her constitutional rights was infringed by this alleged conduct, it is up to us to identify the relevant constitutional guarantee.

We believe that plaintiff's contentions are properly understood as alleging a violation of her Fifth or Fourteenth Amendment rights to be free from the coercion of a confession, rather than as a violation of her Fourth Amendment right to be free from the unreasonable seizure of her person. Plaintiff does not allege that it was unreasonable for defendants to call her in to the Liberty branch for questioning. Instead, the alleged conduct that plaintiff contends was unreasonable was, according to plaintiff's own testimony, all directed toward obtaining her confession. She claims that Whalen and Connelly told her that she could not leave until she signed a confession and that they would carry out their threats unless she confessed. She also asserts that Connelly told her that she would not be prosecuted if she confessed. Although plaintiff does not explicitly state a claim for coercion of her confession in violation of § 1983, the complaint does set forth the factual allegations necessary to support such a claim. Accordingly, we will consider plaintiff's contentions that the conditions of the interview violated her constitutional rights under the rubric of a claim for coercion of her confession, *see infra* Part I.B.3, rather than as a Fourth Amendment-based claim for false arrest and/or false imprisonment.

Next, we consider whether Whalen had probable cause to arrest plaintiff on the charge of grand larceny. Defendants argue that even if plaintiff's confession was coerced, Whalen had probable cause to arrest plaintiff for grand larceny based on the other information that he possessed at the time plaintiff was arrested. We are not persuaded.

Whalen testified at his deposition that his decision to arrest plaintiff was based on her confession, the fact that the money was missing, plaintiff's status as head teller and access to the vault, the location of the short bundle in the back of the vault where it would not be discovered right away, plaintiff's imminent transfer, the likelihood that she would be out of the area when the loss was discovered and the unusual number of twenty dollar bills that plaintiff had recently ordered for the branch. *See* Whalen Deposition, at 55–57. Furthermore, Whitmore and Dean signed depositions, under oath, supporting the felony information that Whalen completed before arresting plaintiff. Those documents state that Niemann counted the money in the vault at the close of business on June 29 and that Balanovich discovered the next morning that $3,220 was missing from a bundle of twenties. The depositions also state that the short bundles were stamped with Dean's teller stamp and dated June 23, 1992, but not initialled by anyone. Whitmore's deposition included the information that Dean had told him that she did not have enough money in her drawer to put any bundles into the vault that day. He also stated that Connelly had told him that Niemann confessed to taking the money. Dean's deposition contains her sworn denial that she stamped the short bundle or knew anything about it.

 Plaintiff does not dispute the veracity of the information recited here. Instead, she takes issue with the reasonableness of inferring her guilt from these circumstances alone, without considering the confession. We find plaintiff's contentions convincing. For example, plaintiff points out that all four of the branch employees had access to the vault. She also asserts that all of the other employees knew that she was being transferred to Saratoga and would have had no difficulty finding her when they discovered that money was missing. Furthermore, it is

bank policy to count the money in the vault whenever the teller in charge of the vault changes. If plaintiff were the teller responsible for the vault on the day before she transferred to Saratoga, the money would be counted the day after her departure, at the latest. Any short bundle hidden in the back of the vault would have been discovered at that time. Furthermore, plaintiff has provided uncontroverted testimony that Ahrens authorized her to order the additional twenty dollar bills, as the branch was likely to be particularly busy at that time. *See* Niemann Affidavit, at ¶ 21. None of the information recited in Whitmore and Dean's supporting depositions, with the exception of Whitmore's reference to plaintiff's confession, establishes that plaintiff, rather than one of the other branch employees, was responsible for the theft. Essentially, in order to believe that Niemann is guilty, one must believe the other employees' denials of any involvement in the theft. Without relying on the confession, we can see no objective reason for Whalen and Connelly to give more credence to the denials of the other employees than to that of plaintiff. Hence, we are not persuaded by defendants' contention that Whalen had probable cause to arrest plaintiff without taking into account the confession.

▮▮ Upon evaluating the issue of probable cause based on the information available to Whalen at the time of the arrest, including the confession, we find that we cannot determine on summary judgment whether Whalen had probable cause to arrest plaintiff because genuine questions of fact exist regarding whether the confession was coerced. On the one hand, if the confession was lawfully obtained, Whalen could reasonably believe that plaintiff took the missing money and therefore clearly had probable cause for making the arrest. On the other hand, if Whalen helped Connelly coerce plaintiff's confession, it would not be reasonable for him to rely on the confession in forming his belief that plaintiff committed a crime. Hence, the issue of whether Whalen and Connelly coerced plaintiff's confession is material to resolving the issue of probable cause.

Plaintiff has undoubtedly demonstrated that a genuine issue of fact exists with respect to whether Whalen and Connelly coerced her confession. The only relevant evidence before us is Whalen, Connelly and Niemann's testimony. Plaintiff asserts that she was told, *inter alia*, that if she did not confess, Whalen and Connelly would drag her family through the mud, tell her husband's employer that he was involved in the theft, search her house in front of her children and see that she was "sent away." She also asserts that they told her that she could not leave the conference room until she signed a confession. Whalen and Connelly vehemently deny making any threats at all or telling plaintiff that she was not free to go. If this conflict in the testimony is resolved in favor of plaintiff, as it must be on the present motion, we can only conclude that a reasonable jury could find that her confession was coerced. Until that factual question is resolved, we may not determine whether Whalen had probable cause to arrest plaintiff.

▮▮ With respect to the constitutional injury inquiry, it is clear that plaintiff has alleged a violation of her Fourth Amendment right to be free from the unreasonable seizure of her person. The protection of the Fourth Amendment attaches upon "seizure." Seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir.1991). An arrest is the "quintessential 'seizure of the person.'" *Id.* Clearly, when plaintiff surrendered herself, in accordance with her agreement with Whalen, at the state police barracks to be fingerprinted, photographed and taken before the Town Justice for arraignment, she was seized. *See Albright*, —— U.S. at ——, 114 S.Ct. at 812 (separate opinion of Rehnquist, C.J.) (noting that § 1983 plaintiff's voluntary surrender to police in response to outstanding arrest warrant was seizure). A reasonable person under those circumstances would not have felt free to leave until the arraignment was complete and she was released on bail. Plaintiff has therefore alleged a deprivation of the liberty guaranteed to her by the Fourth Amendment. Accordingly, we deny defendants' motions for summary judgment dismissing plaintiff's

claims for false arrest and false imprisonment, to the extent that they are based on the formal arrest made by Whalen.

### 2. Malicious Prosecution

Plaintiff has also asserted a claim for malicious prosecution against both defendants. The Second Circuit has recently held that plaintiff's cause of action for malicious prosecution implicates her Fourth Amendment right to be free from the unreasonable seizure of her person. *See Singer*, 63 F.3d at 116. Exploring the parameters of the *Albright* decision, the court held that once a plaintiff presents a § 1983 claim for malicious prosecution, a court must determine whether the defendant's conduct was tortious and whether the plaintiff was injured by a deprivation of liberty guaranteed by the Fourth Amendment. *See id.* Presumably, therefore, not all official conduct that could give rise to liability under state law for malicious prosecution supports a malicious prosecution claim under § 1983. Instead, plaintiff must demonstrate that she suffered injury of a dimension significant under the Fourth Amendment. Authority that considers the constitutional injury issue is sparse, as *Albright* and *Singer* are recent decisions and the courts have not yet had opportunity to fully digest their implications. Furthermore, courts more frequently resolve claims for malicious prosecution on the ground that the plaintiff, for one reason or another, has not demonstrated that defendant's conduct was tortious. We may not evade the question of constitutional injury so easily, however, as neither of defendants' arguments about the insufficiency of plaintiff's malicious prosecution claim is persuasive.

▮ In order to state a claim for malicious prosecution, plaintiff must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff, (2) termination of that proceeding in plaintiff's favor, (3) lack of probable cause for the commencement of the proceeding, and (4) actual malice as the motivation for defendants' actions. *See Rounseville v. Zahl*, 13 F.3d 625, 628 (2d Cir.1994). Defendants contend first that they are entitled to summary judgment because the prosecution of plaintiff was sup-

ported by probable cause. Defendants' argument on this issue fails for the same reason that their contention of probable cause for plaintiff's arrest was unpersuasive. The prosecution of plaintiff commenced with Whalen's completion of the felony information. Therefore, it was necessarily based on the same information as Whalen's decision to arrest plaintiff. In the absence of plaintiff's confession, Whalen and his alleged co-conspirators had no information from which a reasonably cautious person could form the opinion that plaintiff, rather than another branch employee, was the guilty party. If we take the confession into account in determining whether probable cause existed, there are issues of fact regarding whether plaintiff's confession was coerced. Therefore, we may not resolve the issue of probable cause on summary judgment.

▮ Defendants further argue, also unsuccessfully, that they are entitled to summary judgment on plaintiff's claim for malicious prosecution because plaintiff has not demonstrated that the prosecution terminated in her favor. The charge against plaintiff was dismissed, on plaintiff's motion, because of the District Attorney's failure to prosecute in a timely fashion. The order of dismissal provides no further information. Under New York law, when "a termination is indecisive because it does not address the merits of the charge, the facts surrounding the termination must be examined to determine 'whether the failure to proceed implies a lack of reasonable grounds for the prosecution.'" *Rounseville*, 13 F.3d at 629. A termination for failure to prosecute is clearly not a determination on the merits of the charge. At her deposition, plaintiff stated that individuals from the District Attorney's office told her that the prosecution was without merit. *See* Niemann Deposition, at 189–91. To date, that testimony has not been controverted. Therefore, plaintiff has demonstrated that a question of fact exists regarding whether the prosecution terminated in her favor.

Therefore, we must confront the issue of whether plaintiff has demonstrated a deprivation of liberty in violation of her Fourth Amendment rights. The Supreme Court has left open the question of what sort of depri-

vation of liberty would satisfy the requirement of constitutional injury. *See Albright,* —— U.S. at ——, 114 S.Ct. at 813. The Second Circuit recently addressed this question, although it also left the issue unresolved because it was able to resolve the plaintiff's malicious prosecution claim on the ground that the prosecution did not terminate in plaintiff's favor. *See Singer,* 63 F.3d at 116–17.

Nevertheless, in the absence of other authority, we look to the *Singer* decision for guidance. In *Singer,* the Second Circuit explained that under New York law, in cases where the plaintiff was arrested without a warrant, the tort of malicious prosecution covers only post-arraignment deprivations of liberty. *See id.,* at 117. The court expressed reservations about whether a plaintiff who was arraigned and released on a personal recognizance bond had shown a post-arraignment deprivation of liberty that rose to the level of a constitutional injury. *See id.* The court noted that the district court in that case had not considered this issue and nothing in the record indicated whether Singer had been subjected to any travel restrictions or required to post bail.

■ We share the *Singer* court's concern, as plaintiff was also arraigned and immediately released. In this case, we know that plaintiff was required to sign an appearance bond, but did not have to pay bail. On its face, the bond does not reveal any restrictions on plaintiff's right to travel, but only requires her to appear before the court at times set by the court to answer the charge against her. The Supreme Court has stated that the Fourth Amendment does not require a pre-trial determination of probable cause for the institution of criminal charges unless the defendant suffers restraints on liberty other than the necessity of appearing for trial. *See Gerstein v. Pugh,* 420 U.S. 103, 125 n. 26, 95 S.Ct. 854, 869 n. 26, 43 L.Ed.2d 54 (1975). Therefore, the requirement that plaintiff appear before the court for hearings or trial on the charge against her would not seem, by itself, to constitute the requisite constitutional injury. *See Williams v. Weber,* 905 F.Supp. 1502, 1511–12 (D.Kan.1995). Under these circumstances, we believe that

the implication of the *dicta* in *Singer* is that plaintiff has not alleged a deprivation of liberty guaranteed to her by the Fourth Amendment.

We note that Justice Ginsburg's concurring opinion in *Albright* suggested, however, that a person in plaintiff's position has alleged an injury of constitutional significance because she remains seized until the charge against her is resolved. As Justice Ginsburg wrote:

A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court ... before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

*Albright,* —— U.S. at ——, 114 S.Ct. at 815. Plaintiff may well have suffered reputational harm from being the subject of a criminal proceeding. Furthermore, while the charge was pending, she made three court appearances and allegedly incurred $13,000 in legal fees. It is clear that plaintiff would not have suffered these consequences if the criminal charge had not been brought against her. However, we do not believe that these harms are sufficient to establish the requisite constitutional injury.

One district court has rejected Justice Ginsburg's reasoning on the ground that if her theory of continuing seizure were applied, every plaintiff who stated a claim for malicious prosecution under state law would also state a claim under § 1983. *See Williams,* 905 F.Supp. at 1511–12. We agree. Presumably, every person who is the victim of an unlawful prosecution must spend time, money and emotional resources preparing a defense. Clearly, every person subject to an unlawful prosecution faces the possibility of reputational harm. If every person who could maintain a state law claim for malicious prosecution could also bring a claim

for malicious prosecution under § 1983, the Second Circuit's requirement of injury of constitutional dimensions, beyond that required to satisfy the elements of the state law tort of malicious prosecution, would be eviscerated. Without any indication that plaintiff was subject to restrictions on her liberty—such as travel restrictions or posting bail—in violation of her Fourth Amendment right to be free from unreasonable seizure of her person, she may not maintain a § 1983 claim for malicious prosecution.

Accordingly, we grant defendants' motions for summary judgment dismissing plaintiff's claim for malicious prosecution.

### 3. Coercion of Confession

■ Plaintiff does not explicitly state a claim under § 1983 for coercion of her confession, but she has pled factual allegations that would support such a claim. Under the liberal approach to pleading taken by the Federal Rules of Civil Procedure, we must, if possible, construe the complaint to give effect to all of its averments. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1286, at 555–56 (1990). Therefore, we construe the complaint to include a claim for coercion of plaintiff's confession.[4] Plaintiff's allegations that her confession was coerced state a claim under § 1983 for violation of her Fifth Amendment privilege against self-incrimination. *See Weaver v. Brenner*, 40 F.3d 527, 535–36 (2d Cir.1994). That right attaches during custodial interrogations of a criminal suspect and is violated by the use of a compelled statement against the declarant at any criminal proceeding. *See id.*, at 534–35.

The Second Circuit, in an opinion addressing whether the use of a coerced confession during pre-trial proceedings violates the declarant's Fifth Amendment rights, has emphasized that the use of a confession against a declarant in *any* criminal proceeding violates the declarant's Fifth Amendment rights

because it could lead to the infliction of criminal penalties against him. *See id.*, at 535–36. By this reasoning, it seems clear to us that plaintiff's confession was used against her in a criminal proceeding. The felony information and Whitmore's supporting deposition referred to the confession as part of the factual basis for the grand larceny charge against plaintiff. Although the District Attorney's office did not pursue the case, the charge, which remained pending for approximately one year before it was dismissed, could have led to the infliction of criminal penalties against plaintiff.

■ Genuine questions of material fact exist, however, with respect to whether the interview conducted by Whalen and Connelly was custodial. The protection of the Fifth Amendment applies only to custodial interrogations and not to questioning to which a suspect submits voluntarily. *See id.*, at 534. In the absence of a formal arrest, the test used in determining whether a suspect is in custody when questioned is an objective one that focuses on whether a reasonable person in the suspect's position would have understood himself to be subject to restraints comparable to those associated with formal arrest. *See United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992). In determining whether a person is in custody, courts look to whether the suspect cooperated willingly with the authorities, whether the setting in which the questioning took place was intimidating and whether any behavior, such as verbal threats or intimidating physical gestures, by the questioners reasonably suggested that the suspect could not terminate the interview. *See id.*, at 98–99.

■ Given the numerous facts in dispute concerning what happened during Whalen and Connelly's questioning of plaintiff, we cannot decide on summary judgment whether plaintiff was in custody. We do not know whether Whalen or Connelly told plaintiff that she could not leave the conference room

4. Plaintiff has made a number of allegations of coercion. *See* Complaint, at ¶¶ 10–16, 18–21, 26. These contentions provide defendants with ample notice that plaintiff was claiming that Whalen and Connelly coerced her confession. Indeed, defendant Whalen's memorandum of law addresses the Fifth and Fourteenth Amendment

issues raised by a claim for coercion of a confession, as well as the Fourth Amendment issues raised by plaintiff's claims for false imprisonment, false arrest and malicious prosecution. *See* Whalen's Memorandum of Law, at 19–23. Defendants, therefore, cannot argue that they are prejudiced by our construction of the complaint.

until she confessed, whether Connelly yelled at her and slammed his fists on the table when informing her that she couldn't leave or whether Whalen or Connelly threatened her. We also do not know whether plaintiff was aware that Whalen was a police officer.[5] This fact is material because a reasonable person would be far more likely to feel subject to restraints comparable to those associated with formal arrest when questioned by Connelly and a police officer than when questioned by Connelly and a "friend." See id., at 99 (finding that suspect was less likely to be subject to coercive pressures if he failed to notice investigating officer's credentials). In short, genuine questions of material fact exist regarding whether plaintiff was in custody or whether she voluntarily cooperated with Whalen and Connelly. Assuming that plaintiff was in custody during the interview and that her Fifth Amendment rights were implicated, there are also, as we discussed above, material questions of fact regarding whether Whalen and Connelly coerced plaintiff's confession.

 Section 1983 claims based on coercive interrogation techniques may also be analyzed under the Due Process Clause of the Fourteenth Amendment in order to ascertain whether the suspect's statements were made voluntarily.[6] See Weaver, 40 F.3d at 536. Under this test, the court must examine all the circumstances surrounding the questioning to determine whether police pressure overcame the suspect's will. See id.; Mitchell, 966 F.2d at 100 (applying same standard to conduct of federal agents under Due Process Clause of Fifth Amendment). More specifically, plaintiff may be entitled to recover on the ground that she was tricked into making her confession. See Mitchell, 966 F.2d at 100. In order to prevail on such a claim, she must prove by clear and convincing evidence that Whalen or Connelly affirmatively misled her as to the true nature of their investigation. Furthermore, their misrepresentations must have materially induced plaintiff to make inculpatory statements. See id. Plaintiff has alleged that Connelly promised her that she would not be prosecuted if she confessed to taking the money. There is no evidence to the contrary except for Whalen and Connelly's denials. As we may not make credibility determinations on summary judgment, we merely note that plaintiff has produced some evidence that she was affirmatively misled by Whalen and Connelly. Once again, we find that a reasonable jury could conclude that plaintiff's confession was coerced.

## II. Qualified Immunity

 Defendant Whalen also seeks summary judgment on the ground of quali-

---

**5.** Defendants argue that we should rely solely on plaintiff's deposition testimony that she did not know Whalen was a police officer until after the interview ended. Defendants therefore contend that we should ignore contrary testimony by Whalen and Connelly. On summary judgment, however, we do not merely accept the plaintiff's contentions as true. Instead, we must draw all justifiable inferences in the nonmovant's favor. There is no requirement that inferences favorable to the plaintiff may only be based on evidence that she has submitted to us. Here, the justifiable inference favorable to plaintiff is that a question of fact exists regarding this issue.

**6.** The Supreme Court's plurality decision in Albright casts some doubt on whether a plaintiff may state a claim for coercion of a confession under both the Fifth and the Fourteenth Amendments. See Albright, —— U.S. at ——, ——, ——, ——-——, 114 S.Ct. at 813, 814, 817, 820–21 (holding, in five separate opinions, that § 1983 claim based on person's arrest cannot be brought under substantive due process where more specific constitutional provision—Fourth Amendment—applies). The Second Circuit has stated that Albright calls into question the continued validity of § 1983 claims based on substantive due process that overlap with § 1983 claims brought under the First and Fourth Amendments. See Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995) (First Amendment); Lennon, 66 F.3d at 423 n. 2; Ayeni v. Mottola, 35 F.3d 680, 691 (2d Cir.1994) (Fourth Amendment), cert. denied, —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995). Similarly, we question whether plaintiff may maintain a substantive due process claim under § 1983 for coercion of her confession if the Fifth Amendment's privilege against self-incrimination covers the conduct at issue.

We note, however, that it is not clear whether plaintiff was in custody when Whalen and Connelly questioned her. The Fifth Amendment does not reach official conduct in non-custodial situations but, in appropriate circumstances, the Fourteenth Amendment may. Hence, we believe that whatever the reach of Albright may be, it does not preclude a substantive due process claim for coercion of a confession in a non-custodial situation.

fied immunity. Police officers, like other public officials, "are immune from § 1983 civil rights suits ... when their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weaver*, 40 F.3d at 532–33 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Even when the right in question is clearly established at the time that the alleged unlawful conduct occurred, an official is still entitled to immunity where it was objectively reasonable for him to believe that the conduct in question was lawful. *See Weaver*, 40 F.3d at 533.

 There is no room for dispute that on July 3, 1992, it was clearly established that the authorities could not lawfully coerce a confession from plaintiff or use it against her in a criminal proceeding. Hence, Whalen is entitled to qualified immunity only if it was objectively reasonable for him to believe that his actions were lawful. Because Whalen and Niemann vehemently dispute what happened at the interview, a factual determination of Whalen's conduct is necessary before we can decide whether it was objectively reasonable for him to believe that his conduct was lawful. *See Weaver*, 40 F.3d at 537.

Likewise, it was similarly well-established on July 3, 1992, that plaintiff had the right to be free from imprisonment, arrest and prosecution without probable cause. Whalen is entitled to qualified immunity on these claims only if it was objectively reasonable for him to believe that he had probable cause for arresting and prosecuting plaintiff. Because genuine questions of material fact exist concerning the lawfulness of plaintiff's confession, we cannot decide this question on summary judgment.

We need not address Whalen's qualified immunity argument in the context of plaintiff's claims for false arrest and false imprisonment arising out of the interview. Obviously, if Whalen had probable cause to question plaintiff, it was objectively reasonable for him to believe that action was lawful. *See Singer*, 63 F.3d at 118 (finding of probable cause "subsumes the issue of immunity").

## CONCLUSION

For the foregoing reasons, we grant defendant Whalen's motion for summary judgment dismissing the claims brought against him in his official capacity. We deny defendants' motions for summary judgment on plaintiff's claims under 42 U.S.C. § 1983 for false imprisonment and false arrest based on plaintiff's formal arrest, but we grant defendants' motions to the extent that plaintiff's claims for false arrest and false imprisonment are based on the fact that she was interviewed. We grant defendants' motions for summary judgment dismissing plaintiff's claim for malicious prosecution. We construe the complaint to include a claim under 42 U.S.C. § 1983 for coercion of plaintiff's confession in violation her Fifth or Fourteenth Amendment rights, and we deny defendants' motions for summary judgment on that claim.